**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| LEE W. FRYE, | : | CIVIL NO.: 1:12-CV-1533 |
| Plaintiff | : | |
| | : | (Magistrate Judge Carlson) |
| v. | : | |
| | : | |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF | : | |
| SOCIAL SECURITY, | : | |
| Defendant | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION

In this case we are called upon to determine whether an Administrative Law Judge (ALJ) erred in deciding when a claimant's compounding series of physical and psychological limitations rendered him disabled.  The Plaintiff, Lee W. Frye, a claimant for Disability Insurance Benefits under Title II of the Social Security Act, brought this action seeking judicial review of the Administrative Law Judge's partially favorable decision, which found that Plaintiff became disabled on April 17, 2010, but was not disabled prior to this date.   The ALJ's partially favorable disability decision set this April 2010 disability onset date based upon undisputed evidence which showed that in April 2010 the cumulative effect of Frye's ailments required him to abandon a second floor apartment when the exertion of climbing these steps became too great for Frye.

1

Because we find that this decision setting the onset date of Frye's disability based upon the actions of the claimant which demonstrated the progressive, and ultimately disabling effect of his medical conditions, is supported by substantial evidence, we will affirm.

## II.    STATEMENT OF THE CASE

On March 27, 2009, the plaintiff filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), pursuant to 42 U.S.C. §§ 401-33, 1381-83(f). (Tr. 124-32.)[1]  Frye initially alleged an onset date of February 2, 2009, when he stopped working as a forklift operator.  (Tr. 144, 148.) This application was denied initially on October 14, 2009.  (Tr. 60.)  Thereafter, Plaintiff filed a Request for Hearing, which was held in front of an Administrative Law Judge ("ALJ") in Harrisburg, Pennsylvania, on August 17, 2010.  (Tr. 21.)  On the day of the hearing, Plaintiff amended his alleged onset date to March 27, 2008, which was one year prior to his application filing date.  (Tr. 25.)  On October 13, 2010, the ALJ issued a partially favorable hearing decision (Tr. 9.) and found Plaintiff was not disabled prior to April 17, 2010, but became disabled on that date when he moved into a one-story apartment from a two-story apartment that had required him to climb and descend stairs.  (Tr. 30-31.)  On June 29, 2012, the

---

[1] "Tr." refers to the transcript from the Social Security Administration and appears as Document 7 on the docket in this case.  The pinpoint citations to the transcript refer to the Bates-stamped number located at the bottom right-hand corner of each page in the record.

Appeals Council denied Plaintiff's Request for Review, thereby affirming ALJ's judgment as the final decision of the Commissioner of Social Security ("Commissioner"). (Tr. 1.)

On August 7, 2012, Plaintiff filed a complaint in this Court seeking review of the ALJ's decision that denied Plaintiff's disability benefits for the period between March 27, 2008, and April 16, 2010. (Doc. 1.) On October 31, 2012, Defendant filed an Answer. (Doc. 6.) The parties have now fully briefed this matter and it is ripe for resolution.

### III.   FACTUAL BACKGROUND

Lee Frye was born on July 19, 1973, and was in his late thirties when he filed his DIB application. (Tr. 183.) Before claiming disability, Frye worked as a fast food worker, fork lift operator, kitchen helper and poultry worker. (Tr. 52.) Frye performed work after his amended alleged onset date until January 2009. (Tr. 12.)

### A.   Physical Health

With respect to Frye's physical condition, the medical evidence presented an equivocal picture, but a picture marked by a steady decline in Frye's health of physical capacity over time until April 2010 when Frye could no longer climb the stairs of his apartment. Thus, the medical evidence revealed that Frye was morbidly obese. (Tr. 249.) He was 5'11'' tall and weighed approximately 450 pounds at the time of the administrative hearing. (Tr. 39.) On April 27, 2009, Frye was

3

diagnosed with sleep apnea  (Tr. 242.)  and was prescribed a Continuous Positive Airway Pressure (CPAP) device to wear during sleep (Tr. 243.).  His cardiologist, Dr. Steven Jones, indicted that he was almost certain that Frye's breathing problem was related to his obesity.  (Tr. 249, 304.)  At time of the hearing, Frye indicated that he spent most of the day lying in bed (Tr. 47.) and would elevate his legs five or six hours a day.  (Tr. 51.)

Frye was involved in a car accident in 1996 which injured his pelvis and knee.  (Tr. 39.)  As a result, his pelvis was implanted with support hardware that he can feel each time he moves, and Frye alleged that he feels a grinding, painful sensation every time he shifts positions.  (Tr. 39.)  However, with respect to Frye's injuries, Dr. Tanner, a family practitioner, reported to an agency claims representative that Plaintiff had no recent treatment and was not in need of any treatment.  (Tr. 300.)  Moreover, Frye himself continued to work for a number of years following this injury and accident.

Prior to April 17, 2010, Frye lived in a second floor apartment, which would require him to climb about seven or eight steps.  (Tr. 40.)  Plaintiff alleged that the process of climbing these stairs became increasingly arduous over time and stated that it would take him ten minutes and he had to stop twice to climb up all the stairs. (Tr. 40.)  Ultimately, by April 17, 2010, Frye was no longer physically able to climb these stairs and moved into a one-story apartment from this two-story

4

apartment.  (Tr. 30-31.)  Frye further alleged that he was assisted with a walker for a year and half prior to the hearing.  (Tr. 41.)

In April and May 2009, Frye visited Dr. David Tanner and complained of pain in the back, muscles and joints, as well as breathing problems.  (Tr. 188, 246-47.)  Dr. Tanner diagnosed Frye with back pain, leg pain, possible cellulitis, breathing difficulty, possible exertional dyspnea and possible narcolepsy.  (Tr. 241.)  Dr. Tanner noted that Frye was taking medications for high blood pressure, was scheduled for a sleep study, and had some edema in his legs.  (Tr. 255.)  He also prescribed Tylenol for Frye's lower back pain, and referred Plaintiff to a nutritionist for dietary counseling.  (Tr. 255.)

On August 3, 2010, Dr. Tanner completed a physical assessment for Frye.  (Tr. 310.)  He noted that Frye was morbidly obese, and had congestive heart failure at the time of evaluation.  (Tr. 311.)  Dr. Tanner opined that Frye was limited to lifting 10 pounds, standing or walking less than 2 hours in an 8 hour work day, sitting less than 6 hours in an 8 hour work day, limited ability to push/pull with the upper and lower extremities, could never climb ramps, stairs, ladders, ropes or scaffolding, and could never balance, kneel, crouch, crawl or stoop.  (Tr. 311.)  Dr. Tanner also thought that Frye had to limit his exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazards such as machinery or heights and fumes, odors, chemicals and gases due to his difficulty breathing and increased

swelling in his extremities.  (Tr. 313.)  In Dr. Tanner's opinion, Frye would have to lie down with his legs elevated most of the time.  (Tr. 311.)

In contrast, Dr. Jones, Frye's cardiologist, opined that Plaintiff was limited to lifting 25 pounds, standing less than 2 hours in an 8 hour work day (Tr. 331.), with no limit on sitting (Tr. 332.), limited ability to push or pull twenty-five pounds with all extremities (Tr. 332.) and only occasionally climbing ramps, stairs, ladders, ropes or scaffolding and balancing, kneeling, crouching, crawling or stooping (Tr. 332.).  He similarly thought Plaintiff had to limit his exposure to temperature extremes, humidity/wetness, hazards such as machinery or heights and fumes, odors, chemicals or gases.  (Tr. 332.)

## B. <u>Mental Health</u>

Plaintiff obtained a high school diploma.  (Tr. 153.)  He also received vocational and technical training.  (Tr. 213, 296.)  During high school, he attended special education classes in math, social studies and biology.  (Tr. 153, 213, 296.)  His teacher noted that he was a slow worker (Tr. 209.) and needed repetition of instructions.  (Tr. 210.)  In ninth grade, when Plaintiff was fifteen years and nine months old, Psychologist Jim Doonan evaluated Plaintiff's IQ under the Wechsler Intelligence Scale for Children (WISC-R), which yielded a verbal score of 74, a performance score of 77 and a full scale score of 73.  (Tr. 207.)

On August 18, 2010, the day after the administrative hearing, Psychologist Williams D. Thomas, upon referral by counsel, re-evaluated Plaintiff's IQ under the Wechsler Adult Intelligence Scale, Revised (WAIS-R).  (Tr. 326.)  Plaintiff was thirty-seven at the time of the evaluation and scored 78 on the Verbal test, 67 on the Performance test, and 70 for the Full Scale.  (Tr. 328.)  Furthermore, Plaintiff's academic achievement testing showed that his reading and word recognition abilities were at a post-High School level, but his spelling/written expression as well as arithmetic/mathematical computation scores were relatively lower, at seventh and eighth grade level, respectively.  (Tr. 328.)  In Mr. Thomas's opinion, Plaintiff was functioning in the "Borderline Normal" to "Mildly Intellectually Deficient" range. (Tr. 328.)

John Gavazzi, Ph.D., the state agency psychologist who reviewed Plaintiff's claim, found that the medical evidence established a medically-determinable impairment of "Borderline Intellectual Functioning." (Tr. 285.)  He concluded that Plaintiff could make simple decisions and function in production-oriented jobs requiring little independence decision making, and could manage the mental demands of many types of jobs not requiring complicated tasks.  (Tr. 280.)

## IV.   THE FIVE-STEP EVALUATION PROCESS

To be eligible for DIB benefits, the claimant must show that "by reason of any medically determinable physical or mental impairment" due to "anatomical,

physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques," he or she is "not only unable to do [his or her] previous work" but also prevented from "engag[ing] in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3).

In determining disability, the ALJ utilizes a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520 and 416.920; Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999). The ALJ must consider, step by step, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work." 20 C.F.R. § 404.1520; Jackson v. Astrue, 02:08 CV 1407, 2009 WL 1935873 (W.D. Pa. July 2, 2009) (citing Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 118-19 (3d Cir. 2000)).

At step one, the claimant must demonstrate that he is unable to engage in any "substantial gainful activity." 20 C.F.R. § 404.1520(b). Substantial gainful activity is defined as work activity that involves doing "significant physical or mental activities" and is done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572 (a)-(b). If the claimant's earnings are above the specific level set out by the Social Security regulations, it is presumed that he or she has

demonstrated his ability to engage in substantial gainful activity.  20 C.F.R. §§ 404.1574 and 404.1575.  If the claimant engages in substantial gainful activity, he or she is not disabled regardless of how severe his or her physical or mental impairments are and regardless of his or her age, education, and work experience. If the claimant is not engaged in substantial gainful activity, the ALJ should proceed to step two of the analysis.

At step two, the claimant must demonstrate that he or she suffers from a medically determinable impairment or a combination of impairments that is "severe."  20 C.F.R. § 416.920(c).  If the claimant fails to show that his impairments are "severe," his or her application will be denied and the analysis proceeds to step three.

At step three, the ALJ must determine whether the claimant's impairment meets or equals the requirements of any Listing of Impairments, provided in 20 C.F.R. Part 404, Subpart P, Appendix I.  20 C.F.R. § 416.920(d).  "[F]or a claimant to show that his impairment matches a listing, [he] must meet all of the specified medical criteria."  Williams v. Sullivan, 970 F.2d 1178, 1186 (3d Cir. 1992) (quoting Sullivan v. Zebley, 493 U.S. 521, 530 (1990)).  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Id.  If the impairment meets or equals a listed impairment, the claimant is

considered disabled *per se* and the evaluation ends.   Otherwise, the evaluation process moves forward to step four of the evaluation process.

At step four, the ALJ determines whether the claimant has the residual functional capacity to perform his past relevant work.   20 C.F.R. § 416.920(e).   Residual functional capacity refers to "what a [claimant] can still do despite his limitations."  20 C.F.R. § 416.945(a).  If the ALJ finds that the claimant is still able to do his past relevant work, the claimant is considered not disabled and his benefits will be denied.   On the other hand, if the claimant can demonstrate his inability to do past relevant work, the ALJ should move the last step of the evaluation process.

At step five, the ALJ must determine if the claimant can still perform any other work in the national economy despite of the claimant's impairments.   20 C.F.R. § 416.920(f).   It must be noted that the burden of proof shifts from the claimant to the Commissioner at this step.  The Commissioner must then prove that other jobs exist in the national economy in significant numbers for a person with the claimant's abilities, age, education, and work experience.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).   If the Commissioner can demonstrate that the claimant's residual functional capacity still allows him to perform other jobs in the national economy, the claimant is considered not disabled and the evaluation is over.  Otherwise, the claimant is considered disabled and benefits will be granted.

## V.   THE ALJ'S FINDINGS

The ALJ's disability determinations must be supported with adequate explanations of the legal and factual basis that he relied on in rendering his decision.  Schaudeck v. Com. Of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).  If conflicts exist in the evidence, the ALJ must resolve the conflicts and indicate which evidence was accepted and which evidence was rejected and the reasons therefor.  Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981).

Here, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013.  (Tr. 12.)  After proceeding through the five-step evaluation process, the ALJ issued a partially favorable decision and determined that Plaintiff was not disabled prior to April 17, 2010, but became disabled on this date when Plaintiff moved to live in a one-story apartment. (Tr. 30-31.)

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the amended alleged onset date.  (Tr. 12.)  Although Plaintiff continued to work after his amended alleged onset date, the ALJ found the work activity did not rise to the level of substantial gainful activity.  (Tr. 12.)

At step two, the ALJ found that Plaintiff had several "severe" impairments: congestive heart failure, hypertension, morbid obesity, cellulitis in his lower extremities and sleep apnea.  (Tr. 12.)  On the hand, the ALJ found the following

impairments alleged by Plaintiff to be "non-severe" pelvic/lumbar pain and mental retardation. (Tr. 12.)

At step three, the ALJ found that Plaintiff did not have an impairment of combination of impairments that meets or medically equals one of the listed impairment in 20 C.F.R. Pt. 404, Subpt. P, Appx 1. (Tr. 13.)

At step four, the ALJ found that, prior to April 17, 2010, Plaintiff had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b), except:

> "he should never sit more than 6 hours in an 8-hour workday. He should never stand more than 2 hours in an 8-hour workday. [He] must be able to alternate between sitting and standing at will. He must be able to elevate his legs to a 45 degree angle at will. [He] should never bend or kneel. He should never be exposed to hazardous environments, including heights. Moreover, [he] is limited to occasional exposure to extreme temperatures, wetness, humidity and fumes. He is limited to understanding, remembering and carrying out simple instructions. Additionally, [he] can occasionally adapt appropriately to changes in routine work settings."

(Tr. 13.) Moreover, the ALJ found that Plaintiff was able to perform past relevant work as a fast food worker and as a poultry worker, which did not require the performance of work-related activities that were precluded by the claimant's residual functional capacity. (Tr. 16.) Nevertheless, the ALJ found that, beginning from April 17, 2010, Plaintiff's residual functional capacity had prevented him from being able to perform any past relevant work. (Tr. 16.)

At step five, the ALJ found that, starting from April 17, 2010, there were no jobs that existed in significant numbers in the national economy that the claimant can perform, considering the claimant's age, education, work experience, and residual functional capacity.  (Tr. 16.)

## VI.    STANDARD OF REVIEW

Judicial review of disability benefits claims is limited by statute.  42 U.S.C. § 405(g).  Pursuant to the Act, the Court may not review the case de novo or re-weigh the evidence presented to the Commissioner.  Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  Instead, when reviewing the findings and final decisions of the Commissioner, the Court must simply determine whether the decision is supported by "substantial evidence."  42 U.S.C. § 405(g); Schaudeck, 181 F.3d at 431.  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552 (1988); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  It is "less than a preponderance of the evidence but more than a mere scintilla."  Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004).  Overall, the substantial evidence standard is a "deferential standard of review."  Schaudeck, 181 F.3d at 431.  Furthermore, to determine whether a finding is supported by substantial evidence, this Court must

review the record as a whole.  McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 359

(3d Cir. 2004).

## VII.  DISCUSSION

### A.  The ALJ Reasonably Found Plaintiff Did Not Become Disabled Until April 17, 2010

Plaintiff asserts that the ALJ erred in finding that he was capable of

performing past relevant work before he moved to live in a one-story apartment and

that he only became disabled after this new living arrangement.  (Pl.'s Br. 8-9.)  He

asserts that the ALJ failed to adequately explain why the Plaintiff's limitations did

not preclude him from returning to his past relevant work before he moved to a one-

story apartment but did preclude him from performing any substantial gainful work

activity after that date.  Id.  Plaintiff further asserts that the ALJ failed to carefully

consider the physical and mental demands of past relevant work before determining

whether Plaintiff can or cannot return to such work.  Id.

On the other hand, the Commissioner argues that, in deciding that Plaintiff

became disabled on April 17, 2010, rather than on March 27, 2008, the ALJ had

carefully considered all of the medical evidence and testimony and adequately

explained his reasons for making this decision.   (Def's Br. 10-11.)   The

Commissioner asserts that Plaintiff bears the burden to show that he became

disabled since his amended alleged onset date and that he was unable to perform his

past relevant work.  (Def's Br. 11.)  However, Plaintiff failed to demonstrate his disability with objective evidence for the period between the amended alleged onset date and the day before he moved to the one-story apartment.  Id.

When making disability determinations, the ALJ must support his conclusion with adequate explanations of its legal and factual basis.  Schaudeck, 181 F.3d at 433.  The ALJ must also resolve any conflicts in the evidence and he must indicate which evidence was accepted and which evidence was rejected and the reasons for making his selections.  Cotter, 642 F.2d at 706-07.

In this case, the ALJ found that, prior to April 17, 2010, Plaintiff was not disabled and he had the residual functional capacity to perform past relevant work.  (Tr. 13, 16.)  However, the ALJ agreed that Plaintiff became disabled starting from April 17, 2010, after changes after his growing physical limitations compelled Frye to seek a change in his living circumstances.  This evidence, coupled with other evidence in the record, caused the ALJ to find that Frye was no longer able to return to work after this date.  (Tr. 16.)  The ALJ carefully considered all of Plaintiff's physical and mental impairments, and assessed the progressive nature of these impairments, in reaching his partially favorable decision.

With respect to Plaintiff's physical impairments, the ALJ found that Frye suffered from the following "severe" impairments: congestive heart failure, hypertension, morbid obesity, cellulitis in the lower extremities and sleep apnea.

(Tr. 12.)  In reaching this conclusion, the ALJ relied on Dr. Tanner's opinion, who diagnosed Plaintiff with the above impairments.  (Tr. 14.)  "Medical conditions which can be reasonably controlled by medication or treatment are not considered disabling."  20 C.F.R. § 416.930; Bowen v. Bowen, 845 F.2d 1211, 1215 (3d Cir. 1988).  The evidence suggested, however, that Frye's sleep apnea and high blood pressure were reasonably controlled.  Plaintiff's follow-up night sleep studies with CPAP therapy showed improvements.  (Tr. 244.)  As far as Frye's high blood pressure, Dr. Jones prescribed medications for this condition.  (Tr. 307.)

In considering Frye's congestive heart failure, the ALJ noted that Dr. Brian Eramo, an internist who examined Plaintiff in September 2009, noted that Frye denied chest pain, palpitations, or an irregular heartbeat.  (Tr. 14, 249, 264.) Similarly, Dr. Jones, Frye's cardiologist, also reported in May 2009 that Plaintiff denied chest pain, chest pressure, palpitations, and dizziness.  (Tr. 249, 306.) Furthermore, Frye's echocardiogram, taken in April 2009, showed a grossly normal left ventricular ejection fraction and "trivial" aortic valve deficiency, and revealed no evidence of aortic valve stenosis.  (Tr. 257.)  Although Dr. Tanner ultimately diagnosed Frye with congestive heart failure, this assessment took place in August 2010, after the date upon which the ALJ found that Frye had become disabled.  (Tr. 310.)  Earlier evidence in the record from 2009, including the echocardiogram and the doctor's notes indicating Frye's denial of related symptoms, did not suggest that

Plaintiff suffered from severe congestive heart failure until 2010, and, therefore, support the ALJ's findings that the evidence suggested that Plaintiff's medical condition worsened sometime in 2010.  Therefore, the ALJ reasonably relied upon the medical evidence in the record and Frye's own testimony in finding that Plaintiff did not become disabled until April 17, 2010, when the evidence showed that this disabilities forced him to change his residence.  (Tr. 16.)

With respect to Plaintiff's lumbar/pelvic pain, the ALJ found it was a "non-severe" impairment.  (Tr. 12.)  The ALJ noted that Frye, both on his application and during his testimony, alleged that he could not work due to three cracked vertebra, a cracked pelvis and a locked knee, which were injuries resulted from a car accident that occurred fourteen years prior to the hearing.  (Tr. 14, 38.)  However, the evidence indicated that Frye recovered from the injuries and worked for many years after the car accident.  (Tr. 144, 149, 165.)  In addition, Frye's family physician, Dr. Tanner, confirmed in a telephone conversation that the Plaintiff had no recent treatment and did not need any future treatment for these injuries.  (Tr. 300.)  Frye also testified that hardware was inserted to pelvis after the car accident and he felt a grinding painful sensation from it.  (Tr. 39.)  The ALJ found that Frye had pelvic/lumbar pain based on the medical evidence, however, the record "lack[ed] objective medical findings which support[ed] a medically-determinable back impairment."  (Tr. 14.)  The ALJ pointed out that Frye's lumbar spine x-ray, taken

in September 2009 (Tr. 270.), did not show acute osseous abnormality or significant degenerative change.  (Tr. 14.)  Furthermore, the ALJ noted that, despite Frye's allegations of grinding pain at every step he took (Tr. 39.) and Dr. Tanner's opinion that Frye should not climb (Tr. 311.), Plaintiff admitted at the hearing that he lived in a two-story apartment for nine months, which required to him to climb stairs, until April, 2010, when his limitations compelled him to seek other housing.  (Tr. 40.)  The conflicting evidence diminished the credibility of Dr. Tanner's opinion and supported the ALJ's conclusion that Plaintiff was not disabled before April 2010, when he moved to a one story apartment.

The ALJ also considered Frye's intellectual functioning in deciding that Plaintiff had the ability to perform light past relevant work before April 17, 2010. (Tr. 16.)  The ALJ found that Frye's mental limitations were not a severe impairment.  (Tr. 12.)  Although psychologist William Thomas diagnosed Plaintiff as having "mild mental retardation," the ALJ assigned little weight to this evaluation.  (Tr. 15.)  The ALJ may, at his discretion, reject inconsistent medical evidence, but he must adequately explain his reasons for his decision.  Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 121 (3d Cir. 2000).  Here, the ALJ explained that Frye's own work history, such as forklift operation, was inconsistent with a conclusion of mild mental retardation and incapability of competitive employment.  (Tr. 15.)  Also, Dr. John Gavazzi, the state agency psychologist who

reviewed Frye's claim, found that the medical evidence established a medically-determinable impairment of Borderline Intellectual Functioning.  (Tr. 285.)  He concluded that, notwithstanding this limitation, Plaintiff could make simple decisions and function in production-oriented jobs requiring little independence decision making, and could manage the mental demands of many types of jobs not requiring complicated tasks.  (Tr. 280.)  This was consistent with ALJ's finding that Frye was capable of performing past relevant jobs such as a poultry worker and a fast food worker.  (Tr. 16.)  Furthermore, the ALJ noted that no other medical sources indicated that Frye lacked the ability to understand simple instructions or adapt to circumstances in his life.  (Tr. 14.)

In summary, the ALJ reasonably found that Frye became disabled on April 17, 2010, when his physical limitations forced him to change his housing, but not prior to that date, and the ALJ adequately explained his reasons for making this decision, which was based on a careful assessment of the evidence in the record as a whole.  Therefore, we conclude that ALJ's partially favorable decision was supported by substantial evidence, was sufficiently explained, and should be affirmed.

**B.** **The ALJ Did Not Err in Finding Plaintiff Did Not Satisfy the Requirements for Meeting Listing 12.05C for Mental Retardation**

Frye also claims that the ALJ erred in not finding that he suffers from "mental retardation," as defined in Section 12.05 of the Listings of Impairments. (Pl.'s Br. 10-11.)  Frye argues that the ALJ failed to find his performance score of 67 as a valid IQ score for Listing 12.05.  In contrast, the Commissioner asserts that Plaintiff did not meet Listing 12.05 because he did not demonstrate an onset date of mental retardation prior to age 22.   (Def's Br. 16.)   We agree with the Commissioner.

This argument implicates step three of the five-step evaluation process.  In order to qualify for benefits at this step, a claimant must demonstrate that he meets a listed impairment.  The Supreme Court, as well as the Third Circuit Court of Appeals, has repeatedly emphasized that "for a claimant to show that his impairment matches a listing, [he] must meet all of the specified medical criteria." Williams, 970 F.2d at 1186.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify at this step of the social security analytical paradigm.  Id.

Under § 12.05, mental retardation is defined as "a significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22."  20 C.F.R. pt. 404, Subpt. P,

Appx. I § 12.05.  Moreover, "[t]he required level of severity for this disorder is met when the requirement in A, B, C, or D are satisfied."  Id.  Plaintiff does not dispute that he does not meet the criteria for Paragraphs A, B, or D.  However, Plaintiff asserts that he meets the criteria for Paragraph C, which requires him to have "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."  Id.

In order to satisfy the "mental retardation" Listing of Impairment set forth in § 12.05C, Plaintiff must satisfy each of the following three conditions:

1.  He has a valid verbal, performance, or full scale IQ between 60 and 70;

2.  He has another physical or mental impairment, in addition to mental retardation, that imposes an additional and significant work-related limitation; and

3.  His mental retardation was initially manifested before age 22.

Markle v. Barnhart, 324 F.3d 182, 187 (3d Cir. 2003).

The first criteria required the claimant to have a valid IQ score in the range between 60 and 70.  Id.  The claimant is only required to have a valid verbal, performance *or* full scale IQ score.  Where IQ scores are provided in the Wechsler series, the lowest of these three scores should be considered.  20 C.F.R. pt. 404, Subpt. P, Appx. I § 12.00D(6)(c); Markle, 324 F.3d 182 at 186.

In this case, Plaintiff presented two sets of IQ test scores.  Plaintiff was initially tested when he was fifteen years and nine months old, while attending ninth grade.  (Tr. 207.)   His Wechsler Intelligence Scale for Children (WISC-R) test yielded a verbal score of 74, a performance score of 77 and a full scale score of 73. Id.   Plaintiff was re-evaluated in his late thirties under the Wechsler Adult Intelligence Scale (WAIS-R), by psychologist William D. Thomas.  (Tr. 326.)  This test yielded a verbal score of 78, a performance score of 67 and a full scale score of 70. Id.

Plaintiff argues that he meets the first criteria of Listing 12.05C because he has a valid performance score of 67.  (Pl.'s Br. 8-9.)  We agree with Plaintiff that the ALJ erred in failing to consider the lowest of the three scores.  It is clear from the record that the ALJ only addressed the verbal IQ score of 78 and thought it was "inconsistent with the diagnosis of mental retardation and incapable of competitive employment."  (Tr. 15.)  However, as noted, the ALJ should only consider the lowest valid IQ score.  In fact, both Plaintiff's performance score of 67 and full scale score of 70 satisfied the IQ requirement in the range between 60 and 70. Thus, this condition was satisfied.

In order to satisfy Listing 12.05C, a claimant must demonstrate that in addition to mental retardation, he suffers from some other physical or mental impairment that imposes an additional and significant work-related limitation.

Markle, 324 F.3d 182 at 186.  This element is not at issue in this case.  The ALJ found Plaintiff had a list of severe impairments, in addition to mental retardation, including congestive heart failure, hypertension, morbid obesity, cellulitis in lower extremities and sleep apnea.  (Tr. 12.)  Therefore, this second criterion is satisfied.

However, Plaintiff failed to satisfy the third criterion applicable to a claim of disability under Listing 12.05C because he failed to establish that his mental retardation was initially manifested before the age of 22.  Markle, 324 F.3d 182 at 186.  When Plaintiff was initially evaluated by Dr. Doonan at 15 years and 9 month old, all his IQ scores were above 70 (Verbal 74, Performance 77 and Full Scale 73) (Tr. 207).  None of these scores fell within the required IQ range for mental retardation under Listing 12.05C.  Although Plaintiff had a valid verbal IQ score of 67 and full scale score of 70, this test was administered when Plaintiff was in his late thirties, not before age 22.  (Tr. 326.)  These scores were, therefore, incapable of establishing mental retardation before the age of 22.

Additionally, Dr. Doonan diagnosed Plaintiff with "Borderline Intellectual Functioning," not with mild mental retardation.  (Tr. 59, 285.)  Frye asserted that this set of IQ test scores should be considered invalid because the test was administered before Plaintiff turned age 16.  Plaintiff cited to provision 20 C.F.R. pt. 404, Subpt. P, Appx. I § 112.00D(10), which stated that "IQ tests tend to stabilize by the age of 16."  We find this argument unconvincing because the

provision only states that IQ tests "tend to" stabilize by the age of 16, and thus does not foreclose the possibility for a child's IQ to stabilize before reaching age 16. Also, although Plaintiff had not yet turned 16 when he took this IQ test, he was close enough to be 16 years old (i.e. 15 years and 9 months). (Tr. 207.)  In any event, this argument is largely academic, since Plaintiff did not establish that he was mentally retarded prior to age 22.

Plaintiff endeavors to support his claim by noting that he had to attend special education classes in math, social studies and biology in high school (Tr. 213.) and his teacher noted that he was a slow worker (Tr. 209.) and needed repetition of instructions. (Tr. 210.)   Although these facts could be evidence suggesting some mental limitations, the record showed that Plaintiff graduated high school, earning a diploma, (Tr. 153.), and engaged in competitive employment for many years after graduation (Tr. 15.), facts that were not supportive of, and indeed undermined, the claim that Plaintiff had mild mental retardation.

Finally, no other medical sources in the record suggested that Plaintiff exhibited deficits in adaptive functioning.  John Gavazzi, Ph.D., the state agency psychologist who reviewed Plaintiff's claim, found that the medical evidence established Borderline Intellectual Functioning, not Mental Retardation.  (Tr. 285.) Dr. Gavazzi concluded that Frye could make simple decisions and function in production-oriented jobs requiring little independence decision making, and could

manage the mental demands of many types of jobs not requiring complicated tasks. (Tr. 280.)  Dr. Gavazzi's opinion undermines Plaintiff's claim that he is mentally retarded, or that he was mentally retarded as of age 22.

In sum, Frye had the burden to prove with objective evidence that he manifested mental retardation before the age of 22; Plaintiff failed to meet his burden of proof.  Even if we accepted as true that Frye's IQ scores achieved when he was 15 years and nine months old were invalid because Plaintiff had not yet reached age 16 at the time of evaluation, Frye nevertheless failed to provide another set of valid scores administered before age 22 that could demonstrate he in fact suffered from mental retardation at that time.  Moreover, other evidence in the record such as Plaintiff's ability to complete high school and to engage in gainful employment further undermined his effort to establish that he was mentally retarded before he reached the age of 22.  Because Plaintiff failed to satisfy each of the three criteria to show that he met a listing under Listing 12.05C, and because the ALJ appropriately declined to find that Plaintiff met such a listing, the ALJ's decision finding that Plaintiff was not disabled per se under Listing 12.05C should be upheld.

### C.     The ALJ Did Not Err in Failing to Give Controlling Weight to Dr. Tanner's Opinion on Plaintiff's Physical Limitations

Frye also asserts that the ALJ erred in not giving controlling weight to Dr. Tanner's opinion on his physical limitations.  (Pl.'s Br. 12.)  The Commissioner

disagrees, and maintains that the ALJ was not required to fully credit the opinion of Plaintiff's treating physician because it was inconsistent with other evidence in the record. (Def's Br. 19-21.)

Although significant weight is often given to the treating physician's opinion, 20 C.F.R. § 404.1527(d)(1)-(2); Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001), the ALJ is not required to fully credit the opinion of a treating physician, Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). The law is clear that "[t]he ALJ—not treating or examining physician or State agency consultants—must make the ultimate disability and [residual functional capacity] determinations." Id; 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c). A treating physician's opinion can be entitled to "controlling weight," but only if the opinion "on the nature and severity of a claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(d)(2); Fargnoli, 247 F.3d 34 at 43. In other words, if the treating physician's opinion is inconsistent with other evidence in the record, the ALJ may discredit it as long as he explains his reasons for doing so. Id.

Here, Frye asserts that the opinion of Dr. Tanner, the treating physician, deserves controlling weight, and the ALJ failed to point to contrary evidence in the record for discounting Dr. Tanner's opinion on Plaintiff's limitations. (Pl.'s Br.

12.)   Plaintiff specifically argues that the ALJ misread Dr. Tanner's opinion on Plaintiff's ability to climb.  Id.  Plaintiff asserts that Dr. Tanner meant that "Plaintiff should avoid walking upstairs as much as possible," but the ALJ interpreted it as "Plaintiff could not walk upstairs at all."   Id.  This argument fails because in his opinion, when asked how often the claimant may perform the postural activity such as climbing, Dr. Tanner specially checked the frequency box as "never," indicating that Plaintiff should never climb ramps, stairs ladder, rope and scaffold.  (Tr. 311.) The ALJ also pointed out that Frye admitted at the hearing that he lived on the second floor which required him to climb stairs, thereby diminishing the credibility of Dr. Tanner's opinion that Frye should never climb.  (Tr. 14.)

The ALJ also addressed several other inconsistencies in the record that were contrary to Dr. Tanner's opinion.  For example, the ALJ discredited Dr. Tanner's opinion that Plaintiff's upper extremities were limited to lifting 10 pounds, since no objective evidence supported this limitation.   (Tr. 14.)   In addition, Frye's cardiologist, Dr. Jones, was of the opinion that Plaintiff was capable of lifting 25 pounds instead of 10 pounds.  (Tr. 331.)   Furthermore, Dr. Tanner opined that Plaintiff's ability to manipulate, grasp, grip, finger and feel were limited, however, Frye denied these limitations at the hearing and no objective evidence in the record supported these limitations.  (Tr. 14.)

In making his residual functional capacity determination, the ALJ, therefore, adequately explained his reasons for discounting the treating physician's opinion, by pointing out contrary evidence in the record.   Accordingly, we find that the ALJ appropriately explained the reasons why he declined to fully credit Dr. Tanner's opinion, and thus find that the decision was supported by substantial evidence.

**D.**     **The ALJ Did Not Err in His Consideration of the Impact of Plaintiff's Obesity on His Ability to Work**

Plaintiff also argues that the ALJ failed to consider the impact of Plaintiff's obesity after the ALJ found Plaintiff's obesity as a severe impairment.   (Pl.'s Br. 13.)   The Commissioner counters that the ALJ considered Plaintiff's obesity throughout the sequential evaluation process.  (Def.'s Br. 20.)

According to the Social Security Ruling Section 02-1p, the ALJ is required to consider obesity in the analysis of a claimant's overall medical conditions.  SSR 02-1p, 2002 WL 34686281 (Sept. 12, 2002).   Under this provision, the ALJ must consider obesity in determining whether (1) the claimant has a medically determinable impairment, (2) the impairment is severe, (3) the impairment meets or equals the requirements of a listed impairment, and (4) the impairment prevents the claimant from doing past relevant work and other work that exists in significant numbers in the national economy.  SSR 02-1p.

Here, when assessing whether claimant suffered from any medically determinable impairment and the severity of such impairment, the ALJ found that Plaintiff suffered from morbid obesity and that Plaintiff's obesity was considered a "severe impairment."  (Tr. 12.)   In determining whether Plaintiff met any of the listed impairments, the ALJ correctly observed that there was no listing for obesity.  (Tr. 13.)   Pursuant to SSR 02-1p, an ALJ is directed to consider obesity "as a factor" when determining whether Frye met requirements of any of the listings.  Plaintiff asserts that Frye's morbid obesity satisfies the second criterion in Listing 12.05C, which requires another physical or mental impairment, in addition to mental retardation, that imposed an additional and significant work-related limitation of function on Plaintiff.  (Pl.'s Br. 13.)   Although we agree, this is irrelevant in this case because, as discussed above, Frye failed to establish that  he became mentally retarded before age 22, and thus could not satisfy all three of the conditions necessary to meet a Listing under Listing 12.05C.

The ALJ also considered whether Frye's obesity prevented him from doing past relevant work or other work that exists in significant numbers in the national economy.  In his partially favorable opinion, the ALJ found that Frye's obesity, in conjunction with other medical conditions, prevented Plaintiff from performing past relevant work starting from April 17, 2010; however, Frye was still able to perform light work before this date.  (Tr. 15.)   In making this decision, the ALJ assigned

29

little weight, in Plaintiff's favor, to the residual functional capacity evaluated by the consultative examiner, Dr. Eramo, who thought that Plaintiff had no limitations except in balancing and climbing.  (Tr. 15.)  The ALJ pointed out that Plaintiff's "limitations are caused by body habitus, i.e., obesity."  (Tr. 15.)  The ALJ found that, in considering "a combination of [Plaintiff]'s conditions, including obesity," Plaintiff's residual functional capacity was more limited than what Dr. Eramo had suggested.  (Tr. 15.)  Therefore, it was evident that the ALJ adequately considered the impact of Plaintiff's obesity when making residual functional capacity determinations.  Although the ALJ found that Plaintiff was still able to meet the demands of light work before April, 17, 2010, the ALJ found in Plaintiff's favor that he became disabled after this date.

In summary, we find no error in the ALJ's consideration of Plaintiff's obesity, and there is substantial evidence in the record showing that the ALJ adequately considered the impact of Plaintiff's obesity and its relevance to Plaintiff's residual functional capacity and ability to engage in work.

**E.**        **The ALJ Did Not Err in Declining to Find the Plaintiff's Subjective Complaints Fully Credible**

The Plaintiff further asserts that the ALJ should have found his hearing testimony fully credible.  (Pl.'s Br. 13-14.)  On the other hand, the Commissioner

asserts that the ALJ's credibility determinations are supported by substantial evidence.  (Def.'s Br. 21-22.)

"Once an ALJ concludes that a medical impairment that could reasonably cause the alleged symptoms exists, he or she must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work."  Hartranft, 181 F.3d at 362 (citing 20 C.F.R. § 404.1529(c)).  Specifically, the ALJ must determine the "extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it."  Id.  All "[a]llegations of pain and other subjective symptoms must be supported by objective medical evidence."  Id.  Furthermore, the ALJ must examine "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's subjective] statements and the rest of the evidence."  20 C.F.R. § 404.1529(c).  If the "claimant's testimony is reasonably supported by medical evidence," the ALJ "may not base [his] decision upon mere disbelief of the claimant's evidence …. [and] must present [contrary] evidence to refute the claim."  Williams, 970 F.2d at 1184-85.  The ALJ's credibility determination should be upheld unless it is "inherently incredible or patently unreasonable."  Id.

In this case, the ALJ did not fully credit Plaintiff's subjective allegations concerning the intensity, persistence and limiting effects of the alleged pain and

symptoms because he found Plaintiff's allegations were "inconsistent with the residual functional capacity assessment."  (Tr. 14.)   Although in his opinion the ALJ did not cite to any contrary evidence in the record with respect to Plaintiff's subjective testimony, the reason behind this conclusion was similar to the ALJ's explanations for declining Dr. Tanner's medical opinion: it was inconsistent with or undermined by other evidence in the record.  (Tr. 14.)

Dr. Tanner opined that Plaintiff should never climb stairs.  (Tr. 311.)  Yet, Plaintiff testified that he climbed stairs on a regular basis to get to his second floor apartment in which he lived in prior to April 17, 2010.  (Tr. 40.)   The ALJ emphasized the fact that Plaintiff lived in an apartment that required him to climb stairs was contradictory to Dr. Tanner's opinion that Plaintiff should never climb stairs.  Similarly, Plaintiff's living arrangement for nine months that required him to climb stairs was also contradicted Frye's allegation that he feels a grinding, painful sensation every time he moves.  (Tr. 39.)  Although the evidence on this issue was not overwhelming, we cannot say that the ALJ unreasonably discredited Plaintiff's subjective complaints of disabling pain before his poor health compelled Frye to move to a one-story apartment, since this new living arrangement was more consistent with Plaintiff's allegations concerning the intensity, persistence and limiting effects of his pain.  Moreover, Frye also admitted that he continued to work (i.e. forklift operation) until January of 2009, a level of acknowledged physical

activity which was also consistent with the ALJ's finding that Frye was at least able to perform light work before April, 17, 2010.  Since Frye's living arrangement and lifestyle prior to April 17, 2010, was inconsistent with, and undermined, his allegations of severe pain, the ALJ's conclusion to not fully credit Plaintiff's testimony was supported by "substantial evidence," as that term is defined under the Act.

## VIII.    CONCLUSION

Accordingly, for all of the foregoing reasons, the partially favorable decision of the Commissioner is AFFIRMED.  An appropriate order will follow.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge